1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          CENTRAL DISTRICT OF CALIFORNIA

10

11    ZAINAB AUSTIN,                          No. CV 08-8445 PA (MANx)

12              Plaintiff,                     FINDINGS OF FACT AND
                                               CONCLUSIONS OF LAW
13          v.

14    LIFE INSURANCE COMPANY OF
      NORTH AMERICA; UBS AG LONG
15    TERM DISABILITY PLAN; UBS AG
      LIFE INSURANCE PLAN,
16
                Defendants.
17

18

19          This is an Employee Retirement Income Security Act ("ERISA") action for recovery

20    of long-term disability benefits.  Plaintiff Zainab Austin ("Plaintiff") seeks benefits under an

21    employee welfare benefit plan established by her employer, UBS.  On March 29, 2010,

22    following the filing of the Administrative Record and briefing by the parties, the Court,

23    sitting without a jury, conducted a bench trial.  Having considered the materials submitted

24    by the parties and reviewed the evidence, the Court makes the following findings of fact and

25    conclusions of law pursuant to Federal Rule of Civil Procedure 52(a):

26    I.    **Factual and Procedural Background**

27          Plaintiff, who is now 51 years old, was formerly employed by UBS as a Senior Sales

28    Brokerage Assistant earning over $100,000 annually.  (Administrative Record ("AR")

1031.)  Plaintiff was insured by Life Insurance Company of North America ("LINA") for disability insurance through a group policy issued to UBS ("Disability Policy").  (AR 807.) Under the Disability Policy, total benefits are available for an employee disabled from performing her "regular occupation" during the first 24 months of disability.  (AR 1054.) An employee is "totally disabled" if, during the first 24 months of disability, the employee is "unable to perform the material duties of [her] regular occupation, or solely due to injury or illness, [she was] unable to earn more than 80% of [her] indexed covered earnings."  (AR 1054.)  After the first 24 months, the definition of "total disability" changes so that an employee is considered "totally disabled" only if she cannot perform "the material duties of *any* occupation for which [she is] reasonably qualified by education, training, or experience, or solely due to injury or illness, [she is] unable to earn more than 80% of [her] indexed covered earnings."  (AR 1054 (emphasis added).)  The Disability Policy gives LINA the discretion "to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact."  (AR 305.)

By virtue of her employment at UBS, Plaintiff was also insured by LINA for life insurance ("Life Policy").  The Life Policy provided that payment of life insurance premiums was waived for any UBS employee who was eligible for disability benefits ("WOP").  (AR 734.)

Plaintiff suffers from Supravalvular Aortic Stenosis and underwent open heart surgery at age four.  (AR 251.)  Complications from the disease resulted in more open heart surgery in March 2003.  (AR 251.)  Plaintiff returned to work less than two months later. (AR 232.)  However, the surgery was not successful and in November 2004, Plaintiff sought a leave from work due to severe pain, fatigue, and shortness of breath.  (AR 1031.)  Plaintiff applied for short term disability benefits based on "[c]omplications from open heart surgery in 3/2003 -- loss of voice from too little oxygen and chest and back pains."  (AR 902-903.) Plaintiff's primary cardiologist, Norman Lepor, M.D., certified her disability and opined that Plaintiff could not return to work until her heart valve was repaired or replaced.  (AR 875, 879, 895.)

-2-

In a Medical Request Form dated January 21, 2005, Dr. Lepor indicated that Plaintiff was "not allowed to go to work" and noted that she was "severely limited functionally by the pulmonary artery stenosis[,] making her very short of breath even at rest."  (AR 851.)  Dr. Lepor also opined that Plaintiff "will not be able to work until congenital heart defects [are] repaired."  (AR 875).  On February 16, 2005, Plaintiff underwent right and left heart catheterization, selective coronary angiography and aortography, performed by Dr. Lepor.  (AR 789-791.)

LINA extended Plaintiff's short-term disability benefits on February 17, 2005, finding Plaintiff was "symptomatic even at rest."  (AR 201, 847-848, 838-839.)  In February 2005, LINA determined that Plaintiff's job was "sedentary."  (AR 874, 724-728.)  Plaintiff described her job as assisting in the trading process, trades input, confirm, allocate and settle.  (AR 772-775.)  She also paid office expenses, maintained compliance files, and worked with vendors.  (AR 772-775.)  On May 20, 2005, UBS submitted Plaintiff's job description to LINA and confirmed that her job required mental acuity and that she worked in a "Highly stressful environment -- Strong multi-tasking environment."  (AR 1073.)

The following month, Plaintiff's internist, Dr. Flyer, diagnosed Plaintiff with recurrent aortic valve stenosis and chest wall pain syndrome.  (AR 743-744.)  Dr. Flyer filled out a Physical Ability Assessment Form which indicated that Plaintiff could frequently sit, kneel, crouch, and perform fine manipulation, and occasionally push, pull, climb, balance, work extended shifts and overtime, and lift and carry ten to twenty pounds.  (AR 743-744.)

On May 2, 2005, Plaintiff reported to LINA that shortness of breath and pain made it difficult for her to speak, she suffered headaches and chest pain, in addition to back pain with writing or typing, and found it difficult to concentrate or drive.  (AR 772-775.)

Beginning May 24, 2005, LINA began paying Plaintiff long-term disability benefits pursuant to the Disability Policy.  (AR 807.)  LINA concluded that Plaintiff maintained unresolved cardiac issues which precluded her from working in a sedentary position.  (AR 738-739.)  LINA also determined that Plaintiff had "no functional capacity at present."  (AR

135.)  That same month, Plaintiff filed a claim for social security disability benefits through Advantage 2000, a company which provides technical support to individuals and employee benefit plan administrators, including LINA, in establishing entitlement to Social Security disability benefits.  (AR 759.)

In October 2005, LINA received reports from June 2005 by cardiologist Drs. Fontana and Azita Farr.  (AR 664-660.)  Dr. Fontana noted that Plaintiff's chest pain was a limiting symptom and recommended pain management.  (AR 667-668.)  He further noted that the results of prior catheterization revealed "some mild to moderate degeneration of her pulmonary homograft only two years post surgery."  (AR 667-668.)

Plaintiff then began pain management with specialist Jason Hymes, M.D.  (AR 113.)  Dr. Hymes diagnosed Plaintiff with "Intercostal Neuralgia, . . . sustained nerve damage after cardiothoracic surgery," and noted that "medication management, as yet unhelpful, multiple potential side effects anticipated would anticipate several months 4-6 before good control could be achieved."  (AR 643.)  Dr. Hymes indicated that Plaintiff's prognosis was "fair, at best."  (AR 643.)

A note in Plaintiff's file dated February 1, 2006, indicates that Plaintiff informed a LINA claims representative that she wanted to try to return to work for four hours a day, and sought vocational assistance.  (AR 110.)

On February 14, 2006, Plaintiff was advised by Advantage 2000 that her social security claim had been denied and would be appealed.  (AR 613-614.)

On July 28, 2006, Dr. Flyer noted that Plaintiff had "chronic diffuse body pain and fatigue aggravated by activity[,]" and was "unable to sit, bend, lift, use upper extremities, and focus mentally on assigned tasks for any prolonged period."  (AR 541.)  On October 24, 2006, Dr. Flyer completed a form requested by Advantage 2000, on which he stated that Plaintiff had fibromyalgia, demonstrated 14 of 18 tender points, and suffered pain with activity, poor concentration, and poor sleep.  (AR 510.)  Dr. Flyer again noted that Plaintiff was "unable to stand, carry, lift or perform focused activity [for] greater than 1-2 hours."  (AR 509.)  He also stated that Plaintiff's pain/fatigue "constantly" interfered with her ability

-4-

to concentrate.  (AR 509-510.)  On July 5, 2006, Dr. Flyer noted that Plaintiff was doing somewhat better, becoming gradually more active, and Plaintiff was planning a trip to Boston.  (AR 498.)

Plaintiff's echocardiogram, taken on September 26, 2006, showed normal left ventricular size and function without wall motion abnormality, an ejection fraction of 56 percent, mildly increased mitral valve leaflet thickening, moderate mitral regurgitation, mild-moderate aortic insufficiency, trace pulmonary regurgitation, and mild tricuspid regurgitation.  (AR 528.)

On November 13, 2006, LINA advised Plaintiff that the Policy definition of disability would change from "own occupation" to "any occupation" and that it had commenced a review to determine whether plaintiff would remain eligible for benefits.  (AR 338-339.) That day, Dr. Lepor provided LINA with a completed Medical Request Form which advised that Plaintiff was suffering from "severe aortic insufficiency" and "mod[erate] mitral regurgitation," but could return to work "anytime," with specific restrictions of no lifting greater than 15 pounds and for Plaintiff to limit straining activities.  (AR 522.)  Dr. Lepor also provided LINA with a completed Physical Ability Assessment Form, on which he noted that Plaintiff continuously could sit, stand, manipulate and simple grasp; frequently could walk and firm grasp; and occasionally reach, lift, carry ten pounds, push and pull 15 pounds, and climb.  (AR 523-524.)

On November 27, 2006, Plaintiff advised LINA that she continued to have chest and back pain, loss of voice increased by activity and stress, and was unable to focus due to pain and medications. (AR 452-454.)  She noted that she drove only as necessary and was very limited in her activities.  (AR 452-454.)

In February 2007, Dr. Hymes noted in Plaintiff's records that her pain had been going up and down, but that her speech was clear.  (AR 472.)  Dr. Hymes also completed a Physical Ability Assessment Form, in which he reported that Plaintiff continuously could reach, manipulate and simple grasp; frequently sit and firm grasp; occasionally walk, lift and carry ten pounds, climb stairs, stoop, kneel, crouch and crawl.  (AR 465, 468.)  Dr. Hymes

-5-

does not appear to have offered any specific opinion on whether Plaintiff was ready to return to work at that time.

Dr. Flyer's office notes from February 2007 reflect that Plaintiff was doing somewhat better, and that her fibromyalgia was stable. (AR 298.) However, Dr. Flyer indicated that Plaintiff could not work due to aortic valve replacement surgery done in March 2003 and fibromyalgia. (AR 493, 494, 495, 509, 541.) He noted restrictions of no repetitive lifting, bending, transferring, standing or walking, and that activity aggravated Plaintiff's pain and fatigue. (AR 493, 494, 495, 509, 541.) LINA contacted Dr. Flyer in March 2007 to clarify his clinical rationale for the restrictions he had provided. (AR 433.) Dr. Flyer indicated that tender points identified upon exam "confirmed [Plaintiff's] diagnosis of fibromyalgia, a condition involving altered pain thresholds of the spinal cord level. Her function is impaired by activity-induced pain aggravation." (AR 433.) Dr. Flyer further stated that "[a] functional history review confirms ongoing pain aggravation with certain activities including use of upper extremities, bending, prolonged walking." (AR 433.) LINA characterized Dr. Flyer's report as lacking "objective physical or cognitive clinical findings that impair [Plaintiff's] function." (AR 61.)

LINA terminated Plaintiff's benefits by a letter dated March 14, 2007, in which LINA advised, "Neither of your specialists, Dr. Lepor or Dr. Hymes, provided any restrictions to preclude you from your Sedentary occupation . . . Although Dr. Flyer reported that you could not return to work, the medical information on file does not support any restrictions to preclude you from full-time Sedentary work. Your recent exam findings have been minimal and have failed to provide any significant clinical findings to support the restrictions. Dr. Flyer's restrictions are based solely on your subjective complaints of pain." (AR 430.)

On May 11, 2007, the Social Security Administration found Plaintiff to be totally disabled; the Administrative Law Judge (ALJ) agreed. (AR 418.) The ALJ stated in part: "I found [Plaintiff to be] disabled on November 23, 2004 because of Heart disease with serious narrowing of the aorta and pulmonary artery and Fibromyalgia so severe that [her]

impairments medically equal the requirements for one of the impairments listed in the
Listing of Impairments." (AR 399.)  Advantage 2000 provided LINA with the decisions of
the Social Security Administration and ALJ. (AR 398-405.)  Attached to the award was a
list of exhibits considered by the ALJ, which included the findings of the Social Security
Administration's independent cardiologist. (AR 404-405.)

Plaintiff appealed LINA's decision on May 14, 2007. (AR 418-453.)  In connection
with her appeal, Plaintiff submitted a May 4, 2007 letter from Dr. Hymes, which stated that
Plaintiff was taking medications that caused cognitive impairment and drowsiness from time
to time throughout the day, was heavily impaired in reaching, unable to sit longer than ten
minutes, encountered pain on a daily basis that significantly impaired her ability to sit, stand
and walk, was severely disabled with lifting greater than 1 to 2 pounds, and rendered
incapacitated at some times she stooping, kneeling, or crouching. (AR 420.)  Dr. Hymes
noted that Plaintiff's history of open heart surgery contributed to her pain, which was
diagnosed as intercostal neuralgia and myofascial pain syndrome of the right anterior
ribcage. (AR 420.)  The letter further stated that Plaintiff's disability "is of the permanent
state." (AR 420.)

LINA's medical director reviewed Plaintiff's file. (AR 379.)  LINA upheld its
decision by letter dated July 25, 2007, noting that Dr. Lepor indicated that no restrictions
were imposed and that no testing had been provided to support a functional loss or severity
in symptoms indicating that Plaintiff was incapable of performing the duties of her regular
occupation. (AR 377.)  The letter did not discuss the award from the Social Security
Administration. (AR 379.)

On September 20, 2007, Dr. Lepor submitted another Physical Ability Assessment
Form to LINA, which indicated that Plaintiff could frequently sit, fine manipulate and
simple grasp, but could only occasionally walk, stand, reach, lift, carry, push and pull. (AR
367-368.)  The form did not specifically ask Dr. Lepor if Plaintiff could return to work. On
October 10, 2007, LINA advised Plaintiff that Dr. Lepor had not provided supporting
treatment records "to support his assessment of [Plaintiff's] abilities." (AR 369.)

1    Plaintiff appealed again on December 10, 2007.  (AR 357-364.)  Plaintiff provided a

2    form filled out by Dr.  Lepor on September 28, 2007 which noted a specific restriction that

3    Plaintiff could not work and had a "marked reduction in exercise tolerance."  (AR 360.)  Dr.

4    Lepor also later sent LINA a November 26, 2007 echocardiography report which

5    demonstrated abnormalities including moderate mitral valve regurgitation, mild to moderate

6    aortic insufficiency, and mild tricuspid regurgitation.  (AR 356.)  A chest angiogram taken

7    in May 2007 also showed narrowing of Plaintiff's pulmonary artery.  (AR 987.)  LINA was

8    also provided with a November 21, 2007 letter from Dr. Hymes, noting that Plaintiff

9    encountered extreme pain on a daily basis, while attempting to complete simple tasks such

10   as reaching or picking up articles.  (AR 363.)  Dr.  Hymes stated that Plaintiff was able to sit

11   in ten-minute increments before experiencing pain and numbness in the upper and lower

12   back, due to blocked circulation.  (AR 363.)  Dr. Hymes also noted that Plaintiff was

13   frequently rendered incapacitated when she stooped, knelt, or crouched.  (AR 363.)

14        Plaintiff's file was reviewed by a consulting physician, Dr.  Seifarth.  (AR 18, 907,

15   908.)  LINA upheld its decision by letter dated May 27, 2008, stating that the information

16   available did not support a restriction from a Sedentary occupation.  (AR 313-314.)

17   Although Dr.  Lepor had indicated that Plaintiff was unable to work due to a decrease in

18   exercise tolerance, LINA found that Plaintiff's EEG showed a normal ejection fraction and

19   no other testing had been provided to support such a restriction.  (AR 313.)  LINA also

20   noted that although Dr. Hymes noted that Plaintiff had pain, he did not provide updated

21   office notes documenting any examination findings, and did not provide "formal cognitive

22   measurements" or physical examination findings.  (AR 313.)  LINA advised that, "While we

23   respect the opinion of all medical providers, in order to be eligible for Long Term Disability

24   benefits, we must be provided with the clinical documentation upon which their opinion are

25   based.  Based upon the current information on file, you do not meet the definition of total

26   disability."  (AR 313.)  Accordingly, LINA upheld its prior decision to deny Plaintiff's

27   claim.  (AR 313.)  Again, LINA did not address the Social Security Administration's

28   disability determination.

1    On August 14, 2009, this Court ordered LINA to consider Dr. Grewal's report and

2 additional records of Dr. Lepor produced by Plaintiff, finding that LINA had failed to

3 consider these documents in the first instance. (Docket No. 50.) After reviewing these

4 documents, LINA affirmed its previous denial of Plaintiff's claim, concluding that Plaintiff's

5 medical records do not support the assertion that she cannot work due to congenital heart

6 disease or a psychiatric condition that would preclude her from performing work duties

7 consistent with her job. (AR S056-057.)

8  **II.    Jurisdiction and Venue**

9    This action involves a claim for long term disability benefits under an employee

10 welfare benefit plan regulated by ERISA. As such, the Court has original jurisdiction over

11 this matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). See, e.g., Metro. Life Ins. Co.

12 v. Taylor, 481 U.S. 58, 63, 107 S. Ct. 1542, 1546, 95 L. Ed. 2d 55 (1987); Parrino v. FHP,

13 Inc., 146 F.3d 699, 703-04 (9th Cir. 1998). Venue in the United States District Court for the

14 Central District of California is invoked pursuant to 29 U.S.C. § 1132(e)(2). The parties do

15 not dispute the facts requisite to federal jurisdiction and venue.

16 **III.   Standard of Review**

17    A "denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed

18 under a de novo standard unless the benefit plan gives the administrator or fiduciary

19 discretionary authority to determine eligibility for benefits or to construe the terms of the

20 plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57,

21 103 L. Ed. 2d 80 (1989); Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d

22 863, 866 (9th Cir. 2008). Where the plan vests such discretionary authority in the

23 administrator or fiduciary, the Court reviews the denial of benefits under the plan for an

24 abuse of discretion. Firestone, 489 U.S. at 115, 109 S. Ct. at 957. However, in order for the

25 abuse of discretion standard to apply, the Plan must unambiguously grant discretion to the

26 administrator or fiduciary. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1089 (9th Cir.

27 1999).

28

1    In this case, the policy confers discretionary authority on LINA.  The Disability

2  Policy gives LINA the discretion "to interpret the terms of the Plan documents, to decide

3  questions of eligibility for coverage or benefits under the Plan, and to make any related

4  findings of fact."  (AR 305.)   The Court concludes that the foregoing language

5  unambiguously grants discretion to LINA.

6    Once the Court concludes that the policy vests discretionary authority in the

7  administrator or fiduciary, the Court must determine whether the administrator or fiduciary

8  is operating under a conflict of interest.  In recent decisions, first the Ninth Circuit, and then

9  the Supreme Court, determined that the abuse of discretion standard still applies even when

10 the administrator has a conflict of interest.  See Metro. Life Ins. Co. v. Glenn, 128 S. Ct.

11 2343, 2346, 171 L. Ed. 2d 299 (2008) ("Often the entity that administers the plan, such as an

12 employer or an insurance company, both determines whether an employee is eligible for

13 benefits and pays benefits out of its own pocket.  We here decide that this dual role creates a

14 conflict of interest; that a reviewing court should consider that conflict as a factor in

15 determining whether the plan administrator has abused its discretion in denying benefits; and

16 that the significance of the factor will depend upon the circumstances of the particular

17 case."); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 965 (2006) ("Abuse of

18 discretion review applies to a discretion-granting plan even if the administrator has a conflict

19 of interest.  But Firestone also makes clear that the existence of a conflict of interest is

20 relevant to how a court conducts abuse of discretion review.").

21    Where, as here, an insurer "acts as both the plan administrator and the funding source

22 for benefits," the insurer "operates under what may be termed a structural conflict of

23 interest."  Abatie, 458 F.3d at 965.  In the case of such a structural conflict of interest, the

24 Court is to apply an abuse of discretion review which is "tempered by skepticism

25 commensurate with the plan administrator's conflict of interest."  Id. at 968.  As the

26 Supreme Court explained:

27        We believe that Firestone means what the word 'factor' implies,

28        namely, that when judges review the lawfulness of benefit

-10-

denials, they will often take account of several different

considerations of which a conflict of interest is one. . . . In such

instances, any one factor will act as a tiebreaker when the other

factors are closely balanced, the degree of closeness necessary

depending upon the tiebreaking factor's inherent or case-specific

importance.

Glenn, 128 S. Ct. at 2351; see also Abatie, 458 F.3d at 968 ("A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage.  An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might."); id. at 968-69 ("The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.") (internal citations omitted).  In determining whether the insurer has abused its discretion, the court must also consider other case-specific factors, including the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review, whether the administrator provided its experts with all of the relevant evidence, and whether the administrator considered a contrary Social Security Administration disability determination.  Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 630 (9th Cir. 2009); Metro Life Ins., 128 S. Ct. at 2352; Saffon, 522 F.3d at 869-73.

"What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan

administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." <u>Abatie</u>, 458 F. 3d at 969.  In other words, "[a] district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage." <u>Id.</u> at 968; <u>Saffon</u>, 522 F.3d at 868-69.  "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." <u>Abatie</u>, 458 F.3d at 970.

**IV.   <u>Analysis</u>**

LINA does not dispute that it is an inherently conflicted administrator insofar as it is both the claim administrator and insurer of the Disability Policy. (LINA Trial Brief, p. 12.) However, LINA contends that a heightened level of scrutiny is not warranted here because its conflict of interest did not affect its decision to deny Plaintiff benefits under the Policy. (LINA Responsive Brief, p. 5.)  Under <u>Abatie</u>, the Court may weigh LINA's conflict more heavily if it failed to investigate Plaintiff's claim adequately, failed to credit Plaintiff's reliable evidence, or made decisions against the weight of evidence in the record.  For the reasons set forth below, the Court finds that LINA's conflict of interest improperly motivated its decision to terminate Plaintiff's benefits, thereby constituting an abuse of discretion.

**A.   Failure to consider Plaintiff's Social Security Award**

The administrative record shows that LINA did not address Plaintiff's Social Security Award at all, despite the similarity between the Social Security Administration's definition of "disability" and the Disability Policy's definition of "total disability."  Under the Disability Policy, Plaintiff was considered "totally disabled" if she could not perform "the material duties of any occupation for which [she is] reasonably qualified by education, training, or experience, or solely due to injury or illness, [she is] unable to earn more than 80% of [her] indexed covered earnings."  Similarly, the Social Security Administration

-12-

1    defines "disability" as the "inability to engage in any substantial gainful activity by reason of

2    any medically determinable physical . . . impairment" that is of "such severity that [the

3    claimant] . . . cannot, considering his age, education, and work experience, engage in any

4    other kind of substantial gainful work which exists in the national economy, regardless of

5    whether such work exists in the immediate area in which he lives."  42 U.S.C. §

6    423(d)(1)(A), (2)(A).

7        ERISA plan administrators are not bound by the Social Security Administration's

8    determination.  Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 635 (9th Cir.

9    2009).  However, "complete disregard for a contrary conclusion without so much as an

10   explanation raises questions about whether an adverse benefits determination was the

11   product of a principled and deliberative reasoning process."  Id.  "In fact, not distinguishing

12   the [Social Security Administration's] contrary conclusion may indicate a failure to consider

13   relevant evidence."  Id.

14        Here, the Social Security Administration found that Plaintiff was totally disabled and

15   thus entitled to an award of benefits "because of Heart disease with serious narrowing of the

16   aorta and pulmonary artery and Fibromyalgia so severe that [her] impairments medically

17   equal the requirements for one of the impairments listed in the Listing of Impairments."

18   LINA made a contrary determination, but made no attempt to explain why its decision

19   differed from that of the Social Security Administration.  Even after Advantage 2000

20   provided the favorable ALJ decision to LINA, and it was established that the Social Security

21   Administration's independent cardiologist found that Plaintiff was disabled, LINA made no

22   attempt to address the findings of ALJ and distinguish the SSA's disability standard from its

23   own.  However, it was LINA that assisted Plaintiff in obtaining Social Security benefits and

24   reaped a financial benefit when benefits were awarded.  These factors raise a question

25   whether LINA's decision was based on a failure to consider relevant evidence.

26      **B.**     **Reliance on Plaintiff's expressed desire to work on a part-time basis**

27        LINA argues that Plaintiff's expressed desire to return to work on a part-time basis

28   should be considered in determining whether LINA abused its discretion.  Specifically,

1   LINA refers to a conversation that Plaintiff had with a LINA claims representative in

2   January 2006, in which she indicated that she wanted to try to return to work for four hours a

3   day.  (AR 110.)  LINA contends that this statement supports its finding that Plaintiff was no

4   longer suffering from a disability that would prevent her from returning to work on a full-

5   time basis.

6          The Court disagrees.  As an initial matter, the Court notes that Plaintiff's expressed

7   desire to try to return to work on a part-time basis does not in itself establish that she was in

8   fact able to do so.  Given that the record does not reflect that Plaintiff ever returned to work

9   at all, it is not clear that Plaintiff would have been able to work, even on a part-time basis.

10  Further, even assuming that Plaintiff was physically able to return to work for four hours a

11  day, this was not reliable evidence that Plaintiff was no longer "totally disabled."  Under the

12  Disability Policy, Plaintiff was "totally disabled" if she could not perform "the material

13  duties of any occupation for which [she was] reasonably qualified by education, training, or

14  experience, or solely due to injury or illness, [she was] unable to earn more than 80% of

15  [her] indexed covered earnings."  (AR 1054.)  Thus, even if Plaintiff was able to work in a

16  sedentary position for four hours a day, there was no indication that she would have been

17  able to earn more than 80% of her indexed covered earnings. Whether Plaintiff was in fact

18  able to return to work part-time and whether Plaintiff was not "totally disabled" under the

19  Policy definition are completely separate inquiries.  See Feibusch v. Integrated Device

20  Tech., Inc., 463 F.3d 880, 886 (9th Cir. 2006).  As such, LINA placed undue weight on

21  Plaintiff's statement that she wanted to try to work for four hours a day.

22          C.     Demand for objective evidence

23          LINA contends that it was entitled to require objective evidence that Plaintiff was

24  totally disabled by her medical condition, such that she was prevented from performing the

25  duties of her regular occupation.  LINA contends that because Plaintiff never provided such

26  evidence, it was entitled to discontinue her benefits.  Specifically, LINA advised Plaintiff

27  that:  "Neither of your specialists, Dr. Lepor or Dr. Hymes, provided any restrictions to

28  preclude you from your Sedentary occupation . . . Although Dr. Flyer reported that you

-14-

could not return to work, the medical information on file does not support any restrictions to preclude you from full-time Sedentary work.  Your recent exam findings have been minimal and have failed to provide any significant clinical findings to support the restrictions.  Dr. Flyer's restrictions are based solely on your subjective complaints of pain."  (AR 430.)

### 1.    Dr. Lepor's findings

LINA's assessment of Plaintiff's ability to return to work seemed to rely heavily on two items in the record: (1) a note made by Plaintiff's cardiologist, Dr. Lepor, on one of LINA's Medical Request Forms; and (2) the responses that Dr. Lepor provided on a Physical Ability Assessment Form.  However, the questions on these Forms and, consequently, Dr. Lepor's responses to them, were ambiguous and confusing.  As such, Dr. Lepor's responses required further investigation and clarification.

On the Medical Request Form, which was completed in November 2006, there is a question which asks, "Could your patient return to work at this time if accommodations were made for the listed restrictions?"  (AR 522.) In response to this question, Dr. Lepor checked the box marked "Yes."  (AR 522.)  However, Dr. Lepor also answered the next question, which asked, "If no, based on your experience, what is your best estimate of when your patient can return to work?"  (AR 522.)  In response to this question, Dr. Lepor wrote "anytime" with restrictions.  (AR 522.)

LINA's reliance on Dr. Lepor's responses on the Medical Request Form is questionable.  As an initial matter, it appears that there may have been some confusion as to what the Form was asking, since Dr. Lepor answered the first question "Yes," but then proceeded to answer the next question, which was predicated on an answer of "No." Because Dr. Lepor should not have answered the second question if his answer to the first question was positive, the fact that he answered both questions indicates that he was either confused by the Form or careless in his responses.  Even if Dr. Lepor had properly responded to the questions on the Form, his response was ambiguous at best.  Given that Plaintiff previously informed LINA that she might be interested in returning to work for four hours a day, it is conceivable that Plaintiff also conveyed this interest to Dr. Lepor, since he

1   was Plaintiff's primary cardiologist.  However, the Form does not specify whether it is

2   asking about Plaintiff's ability to return to work on a part-time or full-time basis.  As such,

3   Dr. Lepor's responses may have been based on his assumption that Plaintiff was only being

4   evaluated on her ability to return to work for four hours a day, rather than eight.  In the

5   absence of any further explanation, LINA should have sought clarification of Dr. Lepor's

6   statement.  Instead, LINA relied on Dr. Lepor's responses to somehow conclude that

7   Plaintiff was able to return to "full-time Sedentary work."  By doing so, LINA not only

8   came to a conclusion that was not supported by the evidence, but also placed undue weight

9   on an ambiguous response in the Medical Request Form in determining whether Plaintiff

10  was entitled to disability benefits.

11       Dr. Lepor's other statements and notes regarding Plaintiff's condition also seem to

12  contradict his note on the November 2006 Medical Request Form.  On an earlier Medical

13  Request Form that Dr. Lepor completed in January 2005, he opined that Plaintiff "will not

14  be able to work until congenital heart defects [are] repaired."  (AR 875).  Given that

15  Plaintiff's heart defects still have not been repaired to date, Dr. Lepor's note that Plaintiff

16  could return to work "anytime" was contrary to his January 2005 assessment of Plaintiff's

17  condition.  Dr. Lepor also completed a Medical Request Form in September 2007, in which

18  he specifically noted that Plaintiff "cannot work" and had a "marked reduction in exercise

19  tolerance."  (AR 360.)  Dr. Lepor's responses on the September 2007 Form were therefore in

20  stark contrast to his note on the November 2006 Form.  Given the inconsistency between Dr.

21  Lepor's responses on the Medical Request Forms before and after the November 2006 Form,

22  it appears that LINA overemphasized the importance of the November 2006 Form.  At a

23  minimum, LINA failed to adequately investigate Plaintiff's claim insofar as it failed to

24  follow up with Dr. Lepor to seek clarification of his opinion that Plaintiff could return to

25  work.

26       LINA's reliance on Dr. Lepor's responses to the November 2006 Physical Ability

27  Assessment Form is also questionable.  The Physical Ability Assessment Form is a grid

28  form in which physicians are asked to place a check mark in the applicable box noting the

-16-

1   frequency with which a patient can perform tasks such as sitting, standing, walking,

2   grasping, and lifting.  (AR 523.)  On the Physical Ability Assessment Form that Dr. Lepor

3   completed in November 2006, he checked off boxes indicating that Plaintiff could

4   "continuously" sit and stand, "frequently" walk, and "occasionally" reach, lift, push and pull

5   15 pounds, and climb.  (AR 523-524.)  LINA relies on this Form in noting that Dr. Lepor did

6   not impose any restrictions on Plaintiff that would prevent her from working full-time in a

7   sedentary occupation.

8          However, the Form specifically asks that a physician "check the boxes corresponding

9   to the patient's level of physical functioning," thereby asking that the responding physician

10  focus entirely on the patient's physical ability, notwithstanding any pain that might result.

11  Given that one of the most limiting restrictions on Plaintiff's ability to return to work was

12  her constant pain, Dr. Lepor's responses on the Physical Ability Assessment Form were not

13  necessarily an accurate reflection of Plaintiff's actual ability to engage in full-time work.  As

14  such, LINA failed to adequately investigate Plaintiff's claim by relying solely on Dr.

15  Lepor's check marks, rather than attempting to clarify his responses.

16                  2.   Dr. Hymes' findings

17         LINA also appears to have placed great weight on Dr. Hymes' completion of a

18  Physical Ability Assessment Form in February 2007, in which he indicated that Plaintiff

19  could frequently sit, occasionally walk, and continuously reach, manipulate and simple

20  grasp.  (AR 465, 468.)  However, as discussed above, the wording of the Form raises a

21  question as to whether Dr. Hymes' assessment accounted for the possibility that Plaintiff

22  might experience disabling pain while performing these activities.  Moreover, unlike Dr.

23  Lepor, Dr. Hymes did not actually offer an opinion on Plaintiff's ability to return to work.

24  Nor did Dr. Hymes address whether Plaintiff's pain medication might prevent her from

25  returning to work or impair her ability to focus at work.  Indeed, Dr. Hymes' office notes

26  from February 2007 indicate that Plaintiff was suffering from level-4 pain on a scale of 1 to

27  10.  (AR 472.)  In response to Plaintiff's symptoms, Dr. Hymes renewed her pain medication

28  and recommended a follow-up appointment in four to six weeks.  (AR 472.)  These office

notes indicate that Plaintiff experienced constant, moderate pain even while taking pain medication.  However, LINA did not ask Dr. Hymes for clarification of his responses to the Physical Ability Assessment Form, despite the apparent incongruity between his responses on the Form and his office notes.

Other evidence in the record also suggests that LINA overemphasized the importance of Dr. Hymes' evaluation of Plaintiff's physical abilities.  On November 21, 2007, Dr. Hymes wrote a letter to LINA stating that Plaintiff encountered extreme pain on a daily basis while attempting to complete simple tasks, was only able to sit in ten-minute increments before experiencing pain and numbness in the upper and lower back, and was frequently rendered incapacitated when she stooped, knelt, or crouched.  (AR 363.)  This letter, which spans just over one full page, goes into considerably more detail than LINA's Physical Ability Assessment Form, which consists of a two-page grid for check mark responses.  Again, this apparent disparity between Dr. Hymes' responses on LINA's grid form and his subsequent letter noting Plaintiff's extreme pain and frequent incapacitation warranted further investigation and clarification.  However, LINA did not seek any clarification from Dr. Hymes.

### 3.   Dr. Flyer's findings

Dr. Flyer, Plaintiff's internist, indicated on a Medical Request Form completed in February 2007 that Plaintiff could not yet return to work, due to a primary diagnosis of fibromyalgia.  (AR 493.)  In an accompanying Physical Ability Assessment Form, Dr. Flyer also indicated that Plaintiff's pain and fatigue was aggravated by physical activity, and that Plaintiff could only occasionally sit, stand, walk, and reach.  (AR 494, 495.)  Although LINA did not contact Drs. Lepor and Hymes regarding their assessments of Plaintiff's physical condition, it did contact Dr. Flyer to clarify his clinical rationale.  When Dr. Flyer indicated that tender points identified upon examination confirmed Plaintiff's diagnosis of fibromyalgia, and that a functional history review confirmed ongoing pain aggravation with certain activities, LINA concluded that Dr. Flyer's report was lacking "objective physical or cognitive clinical findings that impair [Plaintiff's] function."  (AR 61.)

1    A plan administrator is bound to engage in a "meaningful dialogue" with the claimant

2 and to consider evidence presented by the claimant.  Booton v.  Lockheed Med.  Benefit

3 Plan, 110 F.  3d 1461, 1463-1464 (9th Cir.  1997).  Failing to properly identify information

4 needed from the claimant or refusing to consider evidence presented is evidence of a conflict

5 and an abuse of discretion.  Id.

6    The Ninth Circuit has noted that "individual reactions to pain are subjective and not

7 easily determined by reference to objective measurements."  Saffon, 522 F.3d at 872; see

8 also Cotton v.  Bowen, 700 F.  2d 1403, 1407 (9th Cir.  1986) ("Requiring full objective

9 confirmation of pain complaints before believing them 'would overlook the fact that pain is

10 a highly idiosyncratic phenomenon, varying according to the pain threshold and stamina of

11 the individual victim,' and it would trivialize the importance that we have consistently

12 ascribed to pain testimony, rendering it, in the final analysis, almost superfluous.").

13 Fibromyalgia is a particularly problematic condition insofar as the nature of the condition is

14 entirely "subjective."  Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d

15 869, 872 (9th Cir. 2004) ("Fibromyalgia's cause or causes are unknown, there is no cure,

16 and, of greatest importance to disability law, its symptoms are entirely subjective.  There are

17 no laboratory tests for the presence or severity of fibromyalgia."); see also Minton v.

18 Deloitte & Touche USA LLP Plan, 631 F. Supp. 2d 1213, 1219 (N.D. Cal. 2009) ("By

19 effectively requiring 'objective' evidence for a disease that eludes such measurement, [the

20 insurer] has established a threshold that can never be met by claimants who suffer from

21 fibromyalgia, no matter how disabling the pain.").

22    Here, LINA did not specify what type of "objective" evidence it required to support

23 Dr. Flyer's conclusion that Plaintiff was not able to return to work.  Indeed, given the

24 subjective nature of fibromyalgia, there does not appear to be any purely objective test to

25 measure Plaintiff's inability to function due to pain.  As such, LINA's request for

26 "objective" evidence was essentially a request for evidence that was not available.  To the

27 extent that LINA's denial of Plaintiff's claim was based on the failure to produce evidence

28

-19-

1   that is simply not available, that bears on the degree of deference that the Court should

2   accord LINA's decision.  Saffon, 522 F.3d at 872.

3        It is also notable that LINA did not have any of its doctors conduct an in-person

4   examination of Plaintiff.  Although an in-person examination is neither required nor

5   determinative, it is a relevant consideration, particularly with respect to such "subjective"

6   conditions such as fibromyalgia.  Thus, LINA's purely "paper review" of Plaintiff's file, in

7   addition to its request for unavailable evidence, supports a finding that it abused its

8   discretion in denying Plaintiff's benefits.

9        **D.**    **Failure to consider the lack of change in Plaintiff's condition**

10        Plaintiff argues that LINA abused its discretion in failing to consider the lack of

11   improvement in Plaintiff's heart condition when it terminated her benefits.

12        Where an insurer has already been paying long-term disability benefits to a claimant,

13   that suggests that the claimant was already disabled.  In order to find the claimant no longer

14   disabled, "one would expect the [tests] to show an *improvement*, not a lack of degeneration."

15   Saffon, 522 F.3d at 871 (emphasis in original).  "It is not clear why further degeneration is

16   necessary sustain a finding that [Plaintiff] is disabled."  Montour, 588 F.3d at 635 (internal

17   citations omitted).

18        Here, LINA acknowledges that "[t]he medical records do not document a change in

19   [Plaintiff's] cardiac status since 2005 . . . Echocardiography on November 26, 2007 and on

20   November 20, 2008 demonstrated no appreciable changes when compared to the

21   echocardiographic report dated August 30, 3005."  (AR S57.)  As such, LINA concedes that

22   Plaintiff's cardiac condition has not changed.  Nevertheless, LINA fails to explain how a

23   lack of change in Plaintiff's condition supports a finding that she is no longer disabled.

24   LINA also fails to explain why further degeneration is necessary to sustain a finding that

25   Plaintiff is disabled.

26        Even if further degeneration is somehow necessary, the evidence shows that there is

27   continued narrowing in Plaintiff's right pulmonary artery.  Although LINA noted in its letter

28   of denial that "[t]he CT Angiogram of May 24, 2007 demonstrated no progression of either

-20-

1    ascending aortic or pulmonary narrowings[,]" (AR S57), the Angiogram report specifically

2    states that there were indications that Plaintiff's right pulmonary artery was narrowing: "The

3    previously seen 20mm right pulmonary artery narrowing to 9mm show a 17mm right

4    pulmonary artery narrowing to 7mm.  This is consistent with interval decreased size of the

5    right pulmonary artery."  (AR 987.)  Thus, given LINA's express acknowledgment that

6    Plaintiff's cardiac status remained unchanged, and the additional evidence that Plaintiff's

7    condition actually degenerated, LINA's determination that Plaintiff was no longer disabled

8    is not supported by Plaintiff's medical records.

9         Because the evidence does not support the conclusion that Plaintiff was capable of

10   returning to full-time work in a sedentary occupation, and considering LINA's structural

11   conflict of interest and failure to adequately investigate Plaintiff's claim, the Court

12   concludes that LINA abused its discretion in terminating Plaintiff's benefits.  Because the

13   Court has reached this conclusion without relying on the additional evidence with which

14   Plaintiff seeks to augment the record, the Court denies Plaintiff's request as moot.

15   **V.    Appropriate Remedy**

16        At the trial on this matter, LINA argued that even if the Court found that it abused its

17   discretion in denying Plaintiff her disability benefits, the proper remedy would be to award

18   only those back benefits that would have been due to Plaintiff under the "regular

19   occupation" period of disability.  LINA contends that Plaintiff should not be awarded back

20   benefits under the "any occupation" period of disability because LINA "did not complete its

21   analysis or make a determination under the 'any occupation' standard."  (Def. Supp. Brief,

22   p. 2.)

23        While it is true that LINA terminated Plaintiff's disability benefits during the "regular

24   occupation" disability period, the record establishes that LINA's denial of benefits was

25   actually premised on an evaluation of Plaintiff's disability as it related to both the "regular

26   occupation" and "any occupation" standards.  In LINA's letter to Plaintiff dated November

27   13, 2006, LINA informed Plaintiff that because her claim was approaching the 24-month

28

mark on May 24, 2007, it had "begun a review to determine if [Plaintiff would] remain

eligible for benefits beyond that date." (AR 228.)

LINA's subsequent notes in the claim file indicate that by March 14, 2007, it had

completed the review of Plaintiff's disability under the "any occupation" standard. On a

document with the heading "Claim Strategy," LINA notes the following under a section

entitled "Update Rationale":

> Title                          ongoing file plan, <u>ao</u> deny
>
> Update Rationale          <u>Any Occ</u> Investigation

(AR 57 (emphasis added).) On that same document, under "Claim Status Information,"

LINA's Reviewer and Title Senior Claim Manager, Kelly Mauro, notes:

> I agree with the decision to close the claim at <u>any occ</u>. Two of clmt's three
>
> providers have indicated that clmt has sedentary abilities. The only AP stating
>
> clmt cannot work is clmt's PCP who indicates clmt's fibro symptoms are
>
> preventing her from working in <u>any capacity</u>. NCM contacted PCP who was
>
> not able to provide clinical findings to support his opinion regarding why clmt
>
> is unable to do even sedentary work. At this time we do not have medical
>
> documentation to support clmt is TD from <u>any work</u>. Claim will be closed.

(AR 57 (emphasis added).) In a letter dated the same day, LINA informed Plaintiff that her

long-term disability benefits had been terminated. (AR 430.)

Consistent with the March 2007 notes in the claim file, LINA's notes from Plaintiff's

first appeal, dated July 24, 2007, state: "Recommendation Affirmed, medical does not

support CX TD from <u>own occupation and any occupation</u>. Medical does not provide clinical

evidence of severity in symptoms or functional loss to support disability." (AR 29

(emphasis added).) In the same document, under a section entitled, "Medical Investigation

Results," the LINA reviewer states, "Based on the review of the LTD and WOP claims, it is

concluded that the information on file does not provide the clinical documentation to support

a severity in symptoms or functional loss to preclude the cs from performing her <u>regular or</u>

<u>any occupation</u>." (AR 29 (emphasis added).)

1    LINA repeats these findings in its letter to Plaintiff dated the next day: "Based on the

2    review of your claim, we have concluded that the information on file does not provide the

3    clinical evidence to support a severity in symptoms or functional loss to preclude you from

4    performing your regular or any occupation."  (AR 377 (emphasis added).)

5    Given that LINA's own records show that it denied Plaintiff's claim based on its

6    conclusion that Plaintiff was not disabled under either the "regular occupation" or "any

7    occupation" standards, the Court finds that Plaintiff's disability benefits should be reinstated

8    from the date of termination, March 14, 2007, to the date of judgment in this case.  The

9    Ninth Circuit has held that "retroactive reinstatement of benefits is appropriate in ERISA

10   cases where . . . but for the insurer's arbitrary and capricious conduct [the insured] would

11   have continued to receive the benefits or where there was no evidence in the record to

12   support a termination of benefits."  Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d

13   1154, 1163 (9th Cir. 2001).  "[A] plan administrator will not get a second bite at the apple

14   when its first decision was simply contrary to the facts."  Id.

15   Although LINA cites to a number of cases in support of its assertion that this Court

16   may not award a plaintiff disability benefits under the "any occupation" standard when the

17   insurer itself has not made a determination of the plaintiff's eligibility under that standard,

18   those cases are inapposite.  See Lavino v. Metro. Life Ins. Co., 2010 U.S. Dist. LEXIS 2510

19   (C.D. Cal., Jan. 13, 2010); Frost v. Metro. Life Ins. Co., 320 Fed. Appx. 589 (9th Cir. 2009);

20   Caplan v. CNA Financial Corp., 544 F.Supp.2d 984, 993 (N.D. Cal. 2008).  Unlike the facts

21   in Lavino, Frost, or Caplan, the evidence here shows that even though LINA terminated

22   Plaintiff's benefits while she was still in the 24-month period for evaluation under the

23   "regular occupation" standard, its determination that Plaintiff was not totally disabled was

24   made after evaluating the extent of Plaintiff's disability under both the "regular occupation"

25   and "any occupation" standards.  Thus, because LINA has already made a determination that

26   Plaintiff was not disabled under the "any occupation" standard, this case more closely

27   resembles Pannebecker v. Liberty Life Assurance Co., 542 F.3d 1213 (9th Cir. 2008) and

28   Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154 (9th Cir. 2001), where it was

-23-

1  found that retroactive reinstatement of benefits to the date of judgment was appropriate.  If

2  the Court were to remand Plaintiff's claim to LINA so it could again decide whether

3  Plaintiff was eligible under the "any occupation" standard, LINA would be afforded a

4  "second bite at the apple."  Given that the evidence establishes LINA's abuse of its

5  discretion in failing to seek clarification from Plaintiff's physicians and failing to credit the

6  reliable evidence submitted by Plaintiff, there is no basis on which to find that such an

7  opportunity is warranted.

8                                          **Conclusion**

9         LINA is ordered to reinstate long-term disability benefits to Plaintiff immediately

10  after final entry of judgment by this Court.  LINA is also ordered to retroactively reinstate

11  Plaintiff's long-term disability benefits effective to March 14, 2007.  See Grosz-Salomon v.

12  Paul Revere Life Ins. Co., 237 F.3d 1154, 1163 (9th Cir. 2001) ("[R]etroactive reinstatement

13  of benefits is appropriate in ERISA cases where . . . but for [the insurer's] arbitrary and

14  capricious conduct, [the insured] would have continued to receive the benefits or where

15  there [was ] no evidence in the record to support a termination or denial of benefits.")

16  (internal citations omitted).  Plaintiff is awarded pre-judgment interest on the retroactive

17  benefits in accordance with the rate set forth in 28 U.S.C. § 1961.

18         Given that Plaintiff qualified for a waiver of life insurance premiums while she was

19  disabled under the Disability Policy, and LINA terminated Plaintiff's waiver of premiums

20  when it terminated her disability benefits, this Court also awards Plaintiff past life insurance

21  premiums paid after March 17, 2007.  LINA is further ordered to reinstate the waiver of

22  Plaintiff's life insurance premiums pursuant to the Life Policy, during such time as she

23  remains disabled.

24         "[T]he court in its discretion may allow reasonable attorney's fees and costs of action

25  to either party" in an ERISA action.  29 U.S.C. § 1132(g)(1).  Accordingly, if Plaintiff

26  . . . .

27  . . . .

28  . . . .

                                          -24-

1  chooses to move for attorney's fees, such motion shall be filed in accordance with the Local

2  Rules of the United States District Court for the Central District of California.  See Smith v.

3  CMTA-IAM Pension Trust, 746 F.2d 587, 589 (9th Cir. 1984).

4      The Court will enter judgment in favor of Plaintiff.

5      IT IS SO ORDERED.

6

7  DATED:  April 13, 2010      _____

8                                              Percy Anderson
                                       UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28